# UNITED STATES DISTRICT COURT

_____ DISTRICT OF MASSACHUSETTS _____

UNITED STATES OF AMERICA

v.

JOSE RODRIGUEZ,
    A/K/A "CABLE"

**CRIMINAL COMPLAINT**

M.J. No. 2004 M 0439 RBC

(Name and Address of Defendants)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __December 18, 2003__ in __Essex__ County, in the District of __Massachusetts__ and elsewhere defendants did,

**knowingly and intentionally possess with intent to distribute and distribute heroin, a Schedule I controlled substance,**

in violation of Title __21__ United States Code, Section(s) __841(a)(1)__.

I further state that I am a **Special Agent with the Federal Bureau of Investigation** and that this complaint is based on the following facts:

    **See** attached Affidavit of Jeffrey E. Wood, Jr.

Continued on the attached sheet and made a part hereof: **X** Yes ☐ No

_____
Signature of Affiant
JEFFREY E. WOOD, JR.
Special Agent - FBI

Sworn to before me and subscribed in my presence,

January 19, 2004 at 1:14 pm    at    Boston, Massachusetts
Date                                                        City and State

ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE

_____
Signature of Judicial Officer
HON. ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE
United States District Court
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 6420
Boston, Massachusetts 02210

## **AFFIDAVIT OF JEFFREY E. WOOD, JR.**

I, Jeffrey E. Wood, Jr., being duly sworn, depose and state as follows:

### **INTRODUCTION**

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been employed by the FBI for more than four years. I am currently assigned to the Violent Crime Task Force ("VCTF") investigating, among other things, drug and drug-related crimes in the Lawrence, Massachusetts, area.

2. During my four plus years with the FBI, I have been involved in numerous investigations relating to a wide variety of suspected criminal activity including drug and firearms trafficking, bank robberies, armored car robberies, and kidnaping. I have received training in the field of narcotics enforcement and investigations including, but not limited to, training regarding the identification of common street drugs such as cocaine and heroin. Through my training, education, and experience, I have also become familiar with the manner in which illegal drugs are transported, stored, and distributed, and with the methods of payment for such drugs.

3. I am submitting this affidavit for two reasons. The first is in support of an application for a criminal complaint charging that, on or about December 18, 2003, JOSE RODRIGUEZ, A/K/A "CABLE", possessed with intent to distribute and distributed heroin, a Schedule I controlled substance, in

violation of 21 U.S.C. §841(a)(1). As is explained more fully below, RODRIGUEZ made a controlled sale of heroin to a cooperating witness on December 18, 2003. The sale was surveilled by law enforcement officers and consensually recorded in Spanish.

4. I am also submitting this affidavit in support of an application for the issuance of a search warrant authorizing the search of a commercial automobile repair garage located at 23 Chardon Street, Lawrence, MA, (hereinafter "the Target Premises," more fully described below). As described more fully below, the Target Premises is owned and operated by RODRIGUEZ and is the location where RODRIGUEZ sold the CW the heroin on December 18, 2003, and is where the CW gave RODRIGUEZ the money for the heroin. I submit that there is probable cause to believe that U.S. currency, documents and other records detailing the purchases and distribution of cocaine or other drugs, telephones or communication devices used to facilitate the distribution of narcotics, and other evidence of violations of 21 U.S.C. § 841(a)(1), by RODRIGUEZ are located at the Target Premises.

5. This affidavit is submitted for the limited purpose of establishing probable cause to believe that RODRIGUEZ has committed the above-described offense and that there is probable cause to believe that evidence of that offense is located in the Target Premises. Accordingly, I have not included each and every

fact known to myself and other law enforcement officers involved in this investigation. As a result of my personal participation in the investigation, interviews with and analysis of reports submitted by other law enforcement personnel, interviews of confidential sources, and my consultations with other law enforcement officers, I am familiar with this investigation.

6. The Target Premises is described as follows:

> 23 Chardon Street, Lawrence, Massachusetts, is a two level commercial structure which is owned and operated as an auto body shop by JOSE RODRIGUEZ. 23 Chardon Street is described as a wooden, brick, and cement structure and garage with gray vinyl siding and white trim on the front of the structure. There are two white garage doors at the front of the structure. Above the two doors is a black, yellow, white and red sign that reads: "Rodriguez Auto Body" and contains the phone number (978) 688-6494 and a picture of a red sports car. There is a brick chimney extending above the right side of the roof of the structure. On the north side of the building the wall painted yellow and there is a white door with the sticker letters "O ICE" black in color (see Exhibit A, photograph 2 of 3). At the rear of the building, there is a metal corrugated garage door on the first floor level, which fronts Hampshire Street, Lawrence, MA (see Exhibit A, photograph 3 of 3).

Three photographs of the Target Premises are attached to this affidavit as Exhibit A.

### **INITIATION OF THE INVESTIGATION**

7. For the past six months, I have been the case agent on a multi-agency investigation of the Dome Dwellers, a violent street gang operating in Lawrence, Massachusetts. Since the beginning of the investigation, law enforcement agents have made numerous

3

purchases of controlled substances and firearms from members and associates of the Dome Dwellers using confidential informants and cooperating witnesses. All of the buys and many of the conversations leading up to them have been consensually recorded on audio and/or videotape.

8.  The investigation of the Dome Dwellers was initiated in the Summer of 2003, based on information from law enforcement and confidential sources concerning drug trafficking by the Dome Dwellers in and around the area of the Essex Street Projects in Lawrence, Massachusetts.

9.  Since approximately 2001, the FBI has received information from law enforcement and confidential sources in connection with prior gang investigations that JOSE RODRIGUEZ, A/K/A "CABLE", distributes heroin out of an automobile repair garage that he owns and operates at the Target Premises in Lawrence, MA. Over this time, the FBI has also received information from law enforcement and confidential sources that RODRIGUEZ supplies heroin to Lawrence gang members.

10. I and other law enforcement officers employed certain procedures throughout this investigation. Prior to all of the buys, I and/or other law enforcement officials searched the CW and the car he/she would be driving to ensure that the CW had no controlled substances or cash on him/her. Upon completing the search, the CW was given a recording device, a transmitter, a set

4

amount of official government funds ("OGF"), and a car equipped with audio/video surveillance equipment. All of the buys and many of the conversations leading up to them have been consensually recorded on audio and/or videotape.

**BACKGROUND**

11. In December 2003, a cooperating witness working with the FBI (the "CW") made four controlled buys of heroin from RODRIGUEZ and one of RODRIGUEZ's distributors, known as "SHORTY".[1] On December 11, 2003, the CW bought one finger (approximately ten grams) of heroin from RODRIGUEZ and SHORTY for $850. On December 13, 2003, the CW bought one finger of heroin from RODRIGUEZ and SHORTY for $850. On December 18, 2003, the CW bought one finger of heroin from RODRIGUEZ for $850. On December 19, 2003, the CW bought one finger of heroin from RODRIGUEZ and SHORTY for $850. In addition, on December 4, 2003, the CW obtained a sample of heroin from RODRIGUEZ and SHORTY.

12. On December 4, 2003, at approximately 5:45 p.m., under my direction and supervision, the CW went to the Target Premises to meet with RODRIGUEZ. The CW met with RODRIGUEZ and SHORTY at the Target Premises and had a conversation in Spanish. Lawrence Police Detective Richard Brooks, who is fluent in Spanish, and

---

[1] The CW is a convicted drug trafficker with a significant criminal record and has been paid by the government for his/her assistance in this investigation. The CW had sold crack cocaine for RODRIGUEZ for a period of three to four years but had not sold drugs for RODRIGUEZ in the past six to seven years.

5

has known RODRIGUEZ for several years and has spoken with him on several occasions, recognized RODRIGUEZ's voice while listening on the transmitter. RODRIGUEZ told the CW he would sell heroin to the CW for $70 per gram. RODRIGUEZ said he did not have any good heroin at the time but was expecting 300 grams of heroin the following day. RODRIGUEZ also told the CW that "SHORTY" would sell heroin to the CW when RODRIGUEZ was not around.[2]

13. A short time after the CW left the Target Premises, he/she received a call from SHORTY, who said he had the heroin for the CW. The CW met SHORTY at the corner of Hampshire and Park Streets in Lawrence, and SHORTY provided the CW with a small sample of heroin.

14. On December 11, 2003, and December 13, 2003, the CW bought, respectively, one finger of heroin from RODRIGUEZ and SHORTY for $850. On December 11, 2003, the CW went first to the Target Premises where he/she met with RODRIGUEZ and SHORTY, and then went to another location with SHORTY and picked up the heroin, which SHORTY provided to the CW for $850 in OGF. The CW and SHORTY then returned to the Target Premises. When they returned to the garage, RODRIGUEZ inspected the heroin and said

---

[2] During this meeting, RODRIGUEZ also told the CW that, within the next month, he was planning on selling his garage for $280,000, and moving to Puerto Rico and buying land.

6

that it was ten grams.[3]

15. On December 13, 2003, the CW met with RODRIGUEZ and SHORTY at the Target Premises, and then went to another location where SHORTY got the heroin, which SHORTY provided to the CW for $850 in OGF. At my direction, the CW returned to the Target Premises later that day and complained to RODRIGUEZ about the service the CW was getting from SHORTY. RODRIGUEZ told the CW to deal directly with RODRIGUEZ in the future and provided the CW with his cellular phone number -- 978-390-6062.

**THE PURCHASE OF ONE FINGER OF HEROIN ON DECEMBER 18, 2003**

16. On December 18, 2003, I met with the CW, who told me that he/she had received a telephone call from RODRIGUEZ, who asked the CW to come see him because he had some "shit" for the CW (which the CW understood to be heroin from prior conversations with RODRIGUEZ). The CW said RODRIGUEZ called him/her back later and told the CW to bring a bottle of Johnny Walker black label.

17. At approximately 6 p.m. on December 18, 2003, the CW made a consensually recorded call, in Spanish, to RODRIGUEZ at 978-609-2598. SHORTY answered the phone and reminded the CW not to forget the black label. At approximately 6:03 p.m., agents set up surveillance in the area of the Target Premises. I then

---

[3] At my direction, during the December 11 meeting, the CW asked RODRIGUEZ if RODRIGUEZ could get the CW a gun. RODRIGUEZ told the CW that he had a MAC 11 but could not sell it. SHORTY said he would try to get a gun for the CW.

7

searched the CW and the car he/she would be driving to ensure that the CW had no controlled substances or cash on him/her. Upon completing my search, I gave the CW a recording device, a transmitter, $900 in OGF, and a car equipped with audio/video surveillance equipment. I then told the CW to go to the Target Premises and meet with RODRIGUEZ.

18. Agents followed the CW to a nearby liquor store, where the CW bought a bottle of Johnny Walker black label, and then followed the CW to Target Premises, where he/she arrived at approximately 6:19 p.m. The CW went into the Target Premises and gave the black label to SHORTY and then RODRIGUEZ walked by the CW and handed him a "finger" of heroin. The CW put the heroin in his/her pocket and started to take out the money to count it but RODRIGUEZ and SHORTY pointed to the bathroom for the CW to count the money. The CW went to the bathroom, counted the money, and then came back out and handed RODRIGUEZ $850 in OGF.

19. Agents monitoring the transmitter, including Lawrence Police Detective Richard Brooks, who is fluent in Spanish, heard the CW having a conversation in Spanish with RODRIGUEZ. Detective Brooks recognized the voice of RODRIGUEZ as the individual talking with the CW. On the transmitter, Detective Brooks heard the CW ask RODRIGUEZ if it was good and heard RODRIGUEZ reply "yeah". Detective Brooks also heard the CW and RODRIGUEZ having a conversation about the CW being "burnt" (i.e.,

8

ripped off in a drug deal) by "BITIN", previously identified as VICTOR DELGADO, from whom the CW had made several controlled purchases of heroin and who had ripped off the CW for $1,200 in OGF during an attempted controlled buy of heroin on December 17, 2003.

20. The CW was then heard leaving the garage and was followed by agents back to the meeting location where he/she gave me the body recorder, transmitter, $42 in OGF, the car, and what appeared to be a "finger" (generally 10 grams) of heroin, which was contained in a thin rubber like material. I searched the CW and the car for controlled substances and cash and found none.

21. Detective Brooks has reviewed and translated the audiotape of the CW's meeting with RODRIGUEZ on December 13, 2003. Detective Brooks recognized the voice of RODRIGUEZ on the tape recording. On the tape, Detective Brooks heard the CW state "let me take a piss" and then heard the sound of counting money and a knock on a door. Detective Brooks then heard the CW ask "Is it good?" and heard RODRIGUEZ reply "yeah". Detective Brooks then heard the CW and RODRIGUEZ have a brief conversation about the price of heroin and the CW ask if RODRIGUEZ could give him/her a "better price" and RODRIGUEZ reply "What do you mean! No I can't. Your dealing wrong, don't go into a hole." Detective Brooks then heard the CW ask "why" and RODRIGUEZ respond "I told you he gives it to you for ninety" (i.e., $90 a

9

gram, referring to BITIN). The CW then says "He burned me yesterday for a thousand dollars."

22. I have inspected and field tested the contents of the "finger" that the CW obtained from RODRIGUEZ on December 18, 2003. The substance field tested positive for heroin and has been sent to the DEA laboratory for further testing.[4]

## THE DECEMBER 25, 2003 INCIDENT

23. On December 29, 2003, I met with the CW who provided the following information. Between 12:30 a.m. and 1 a.m. on December 25, 2003, the CW was standing outside the Sirena Restaurant on the corner of Jackson and Haverhill Streets when SHORTY came out of the bar and asked the CW to join SHORTY for a drink. About ten minutes after they sat down, the CW saw RODRIGUEZ look into the bar and then leave. The CW told SHORTY that RODRIGUEZ was outside and SHORTY went outside to talk with RODRIGUEZ.

24. After a few minutes, the CW went outside and saw RODRIGUEZ and SHORTY arguing and heard RODRIGUEZ say something to the effect that he wanted his 120 grams. The CW also saw an unknown male standing near RODRIGUEZ and SHORTY. RODRIGUEZ

---

[4] The CW also made a controlled buy of one finger of heroin (for $850 in OGF) from RODRIGUEZ and SHORTY on December 19, 2003. The CW met with RODRUGUEZ at the Target Premises and RODRIGUEZ told the CW that SHORTY had the heroin and to meet with SHORTY. The CW met with SHORTY at a convenience store where they made the exchange. The CW asked SHORTY if the heroin was RODRIGUEZ's and SHORTY confirmed that it was.

10

turned to the CW and said something to the effect that the CW had something to do with it. SHORTY told the CW to go back inside, which he/she did, and a few minutes later SHORTY returned to the bar and said there was a misunderstanding and he would take care of it. The CW saw the unknown male who had been standing outside come into the bar and sit down. After they finished their drinks, the CW and SHORTY left the bar. On the way out, the CW saw the unknown male making a cellular telephone call.

25. As the CW and SHORTY were standing in front of the bar, a black Maxima drove down Haverhill Street, made a right on Jackson Street, turned around by a garage, and parked next to them. The front passenger side window of the Maxima rolled down and the CW saw RODRIGUEZ in the driver's seat and an unknown male in the passenger seat. RODRIGUEZ yelled that they had robbed him and someone had to pay. The unknown male asked several times "want me to do it?" and RODRIGUEZ finally replied "Fuck it. Just do it." The unknown male raised a black pistol and pointed it toward the CW. The CW ducked behind a parked car, heard three or four shots, and then heard the car speed away.

**OTHER EVIDENCE OF RODRIGUEZ'S USE OF THE TARGET PREMISES**

26. Throughout the course of this case, agents have conducted additional investigation indicating that RODRIGUEZ has owned and operated out of the Target Premises. This aspect of the investigation has revealed the following.

11

A. Electric subscriber records obtained from National Grid Electric on 1-13-04 indicated that the electric service at the 23 Chardon Street, Lawrence, MA, is currently subscribed to by JOSE RODRIGUEZ, SS# 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, and has been subscribed to by RODRIGUEZ since 1997.

B. Records obtained on 1-13-2004 from Accurint, a commercial database, indicate that JOSE RODRIGUEZ and RODRIGUEZ AUTOBODY used 23 Chardon Street, Lawrence, MA, when applying for credit in August 2003.

C. Records obtained from Essex County Correctional Facility, Massachusetts Sheriff's Department, indicate that RODRIGUEZ provided his address as 23 Chardon Street, Lawrence, MA, for a booking report dated 2/21/01, and provided that he was self-employed doing body work.

D. In the past two weeks, agents have seen RODRIGUEZ's truck at 23 Chardon Street, Lawrence, MA.

--------

27. Based on the foregoing, I believe there is probable cause to believe that JOSE RODRIGUEZ, A/K/A "CABLE", is engaged in the ongoing business of selling heroin out of the Target Premises. On December 18, 2003, RODRIGUEZ arranged the sale of heroin to the CW. The sale of the heroin took place at the Target Premises and the CW paid RODRIGUEZ the $850 in OGF at the Target Premises. The December 25, 2003 shooting outside the Sirena Restaurant indicates that RODRIGUEZ remains in the drug trafficking business.

28. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice

for individuals who distribute controlled substances to maintain, in a fixed location from where they operate, records relating to their drug trafficking activities.

29. Because individuals who distribute controlled substances in many instances will "front" (that is, sell on consignment) drugs to their clients, or alternatively, will be "fronted" drugs from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often individuals who distribute controlled substances keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") by the trafficker's suppliers and the trafficker's dealers. Additionally, individuals who distribute controlled substances must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

30. Based upon my training and experience, I am also aware that it is a common practice for distributors of controlled substances to conceal sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances such as the $850 in serialized funds that were paid to RODRIGUEZ for heroin at the Target Premises on December 18, 2003. In this connection, drug traffickers typically make use of wire

13

transfers, cashier's checks, and money orders to pay for controlled substances. These types of evidence would typically be maintained in a location where the drug trafficker would have quick, secure, and easy access, such as the trafficker's residences, or, as in this case, a business location from which the drug trafficker operates his trafficking business.

31. Individuals who distribute controlled substances and firearms often stay in contact with their customers and suppliers using cellular telephone equipment. Bills and other documents relating to the usage of such equipment and the information which is frequently stored within it (such as telephone listings of clients and suppliers, speed dialing features and voice mail) are also likely to be present in a trafficker's residence or business location and will confirm prior contacts with suppliers and customers. Here, that equipment is likely to be anywhere inside the Target Premises.

32. During the course of residential and commercial searches, agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification

documents, and keys.

33. My awareness of these trafficking practices, arise from my own involvement in prior drug investigations and searches during my career as a law enforcement officer, my involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior investigations, as well as what other law enforcement agents and officers have advised me when relating the substance of their similar debriefings and the results of their own drug investigations, and other information provided through law enforcement channels.

### ITEMS TO BE SEIZED

34. Based upon all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth above, I submit that there is probable cause to believe that evidence regarding illegal drug activities will be found in the Target Premises. More specifically, I submit that there is probable cause to believe that the following items of evidence will be found in the subject premises:

   1. Books, records, notes, ledgers, and any other papers or records relating to the purchase, transportation, shipment, ordering, sale, importation, manufacture, and/or distribution of controlled substances and/or firearms and/or records relating to the receipt, disposition, and/or laundering of proceeds from the distribution of heroin, and/or records or electronic devices reflecting the identity of co-conspirators and drug customers, as well as their addresses, telephone, and pager numbers. Such documents include, but are not limited to, telephone address books, planners, receipts, state and federal income tax returns and

15

2. supporting paperwork, notes, ledgers, bank records, money orders, wire transfers, cashier's checks, passbooks, certificates of deposit, bills, vehicle rental receipts, credit card receipts, hotel receipts, meal receipts, travel agency vouchers, travel schedules, shipment records, telephone bills and/or toll records and bills.

2. Cash and currency, and other items of value made or derived from trafficking in heroin and documents related thereto. Such items include, but are not limited to jewelry, titles, deeds, monetary notes, registrations, purchase or sale invoices, bank records, or any other papers concerning financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in illegal substances.

3. Documents reflecting dominion and/or control of 23 Chardon Street, Lawrence, MA, including, but not limited to, canceled mail, photographs, personal telephone books, diaries, bills and statements, videotapes, keys, identification cards and documents, airline tickets and related travel documents, bank books, checks, and check registers.

4. Documents or tangible evidence reflecting dominion, ownership, and/or control by JOSE RODRIGUEZ over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5. Photographs of individuals, property, and/or illegal controlled substances.

## CONCLUSION

35. Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that JOSE RODRIGUEZ, A/K/A "CABLE", in engaged in the ongoing

16

business of selling heroin and that, on December 18, 2003, JOSE RODRIGUEZ, A/K/A "CABLE", did possess with intent to distribute and distribute heroin, a Schedule I substance, in violation of Title 21, United States Code, Section 841(a)(1).

36. Based upon the foregoing, and based upon my training and experience, I also submit that there is probable cause to believe that the premises located at 23 Chardon Street, Lawrence, MA, which are more specifically described above, presently contain the items set forth above, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, violations of 21 U.S.C. §§ 841(a)(1). Accordingly, I respectfully request that a search warrant be issued for the seizure of these items in the Target Premises.

_____
JEFFREY E. WOOD, JR.
Special Agent, FBI

Subscribed and sworn to
before me, this 14 day
of January, 2004

_____
ROBERT B. COLLINGS
United States Magistrate Judge

17